IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LARRY DONNELL HARRIS JR.,

                        Plaintiff,

    v.

JEFFREY C. MANLOVE and AMY GUNDERSON,

                        Defendants.

ORDER

17-cv-362-jdp

---

Plaintiff Larry Donnell Harris Jr., appearing pro se, is a prisoner currently housed at Waupun Correctional Institution. Harris was convinced to undergo a blood draw testing him for certain blood-borne pathogens after he assaulted a correctional officer. He alleges that defendant prison officials violated his rights under the Fourth and Fourteenth Amendments to the United States Constitution when they misled him about the scope of a blood draw and the intended use of the results.

Defendants have filed a motion for summary judgment, Dkt. 52, which I will grant. As applied to blood draws from inmates, the limits of the Fourth Amendment and the Due Process Clause of the Fourteenth Amendment are not clearly established. Accordingly, I conclude that defendants are entitled to qualified immunity.

PRELIMINARY MATTERS

This case is about the steps taken by DOC officials to test Harris's blood for pathogens after he was involved in an altercation with non-defendant Correctional Officer Jason Rhode. Under DOC policy, testing can be performed only after a non-DOC "advanced care provider"—a medical professional with authority to prescribe, such as a doctor or nurse practitioner—

concludes that a DOC staff member was "significantly exposed" to another person's potentially infectious bodily fluids. *See* Dkt. 25-1 (the version of the policy in place at the time of the events). Defendant Jeffrey Manlove ordered the blood draw after someone informed him that Rhode had been significantly exposed to Harris's bodily fluids.

Harris filed a motion to compel discovery of the form completed by the outside advanced care provider concluding that Rhode was significantly exposed. Dkt. 30. Harris also sought to compel more detailed answers from defendant Manlove in response to interrogatories about who filled out the exposure form, who told Manlove that there was indeed a significant exposure warranting blood testing from Harris, and who gave the test results to Rhode's medical provider.[1] Manlove's responses to these questions were that he didn't know or didn't remember.

Harris calls these answers evasive; defendants call them Manlove's good-faith responses to the questions. I have no reason to doubt Manlove's assertion. The ordinary way to get around holes in a party's memory is to recover the contemporaneous documents from the events in question. Defendants say that they searched for records and cannot locate the "significant exposure" form completed by an outside provider. Nor does there appear to be any documentation of who communicated the test results to Harris's medical provider. Defendants cannot be compelled to turn over materials they do not have. They have provided Harris with the information they do have from the events in question: incident reports completed after the altercation and Harris's medical records. At summary judgment they have also produced a declaration from Rhode in which he explains that one of his providers told him the test results.

---

[1] Harris states that Rhode's advanced care provider was Dr. Peter Murray. The record here shows that Murray is a physician's assistant, not a doctor, but this distinction is immaterial.

2

Because defendants have provided the information they have, I will deny Harris's motion to compel.

I note that Harris's desire to discover more information about the DOC's response to the altercation is understandable; if defendants had that information it would be discoverable. But as my analysis below shows, the case ultimately does not hinge on the identity of the provider who concluded that there was a significant exposure event, or even whether that conclusion was correct. And although there is no record of how the test results were transmitted to Rhode's provider, Rhode himself says that he did receive the information.

Before defendants filed their summary judgment motion, both parties sought extension of the dispositive-motions deadline. Harris filed a motion asking to extend that deadline to 60 days after a ruling on his motion to compel. Defendants filed a four-day-late brief in response stating that only a short extension was appropriate. Harris filed a motion to strike the late response, Dkt. 46, which I will deny as moot, because defendants later filed their own motion for further extension of the dispositive-motions deadline, Dkt. 51, along with their summary judgment motion. I'll grant in part both parties' motions for an extension and I will allow defendants' motion for summary judgment. There is no need to give Harris more time to file his own summary judgment motion; he has already provided his arguments in favor of his claims. But as explained below, I conclude that his claims must be dismissed under the doctrine of qualified immunity.

UNDISPUTED FACTS

Plaintiff, Larry Donnell Harris, Jr., is incarcerated at Waupun Correctional Institution (WCI). Defendant Jeffrey Manlove is a physician at WCI and defendant Amy Gunderson is a registered nurse who worked at WCI during the events at issue here.

Harris was previously incarcerated at Columbia Correctional Institution (CCI), in Portage, Wisconsin. On February 18, 2016, while Harris was at CCI, he assaulted Correctional Officer Jason Rhode. Rhode said that he does not remember much of the incident. Officers responding to the assault reported that Rhode was bloodied and perhaps suffered a concussion, and they reported seeing "a lot" or "copious amounts" of blood on the floor. Dkt. 55-3, at 3, 7. Harris says that he did not sustain any injuries himself or expose Rhode to any of his bodily fluids.

The DOC's Division of Adult Institutions has a policy about the medical response to employee exposure to blood-borne pathogens such as human immunodeficiency virus (HIV) and hepatitis B and C. *See* Dkt. 25-1, at 11–13 (Division of Adult Institutions Policy DAI Policy No. 500.20.03, "Management of Employee Exposure to Blood Borne Pathogens").[2] Under that policy, a person who "significantly exposes" a prison employee to blood or other bodily fluid should be tested for HIV and hepatitis B and C.

A significant exposure is defined as "[a] contact with a potentially infectious body fluid which is dependent on a number of variables, including: amount of fluid exposure, length of exposure time, depth of injury, source's infectious disease state, as determined by an [advanced

---

[2] Defendants provide and cite a new version of the policy was that was not in effect at the time in question. Dkt. 54-2. Harris objects to this and provides a copy of the policy in effect at the time of events here. *See* Dkt. 25-1, at 11–13. The two versions are very similar but not identical. I will refer to the version provided by Harris.

care provider] in the community." *Id.* at 11. When an inmate is the person who may have exposed an employee to a pathogen, a non-DOC physician must certify that there has been a significant exposure. In keeping with Wisconsin statutes, the inmate must consent to be tested for HIV, and the inmate is asked to authorize disclosure of test results to the medical professional treating the employee facing the risk of exposure. The policy does not discuss consent for hepatitis B and C testing. If an inmate refuses testing, DOC staff may ask the local district attorney to seek a court order to compel a blood test.

Harris was transferred to WCI shortly following the assault. Defendants worked at WCI. On March 11, 2016, almost a month after the assault, Manlove was told to initiate the DOC's "significant exposure" protocols. Manlove did not know the details of the assault, and he does not remember who told him that there had been a "significant exposure." Manlove wrote an order to test Harris for HIV, hepatitis B, and hepatitis C.

Sometime in mid-March 2016, defendant Gunderson was instructed by her unit manager to ask Harris to sign a HIV-test consent form and a medical-information-release form.[3] Gunderson did not prepare these forms herself. This was the only "exposure incident" that Gunderson was involved in while she was employed by the DOC. Gunderson says that she told Harris "something to the effect of, 'there was a significant exposure event and here are two forms to sign.'" Dkt. 68, at 14, ¶ 25. Harris says that Gunderson told him "that HIV testing of his blood is required due to the assault incident at CCI and that Peter Murray, of Dean Clinic, was Rhode's advanced care provider, and would receive the results." *Id.* Harris says that

---

[3] Harris objects to this proposed finding as hearsay, but a command is not hearsay because it is not an assertion of fact. *United States v. White*, 639 F.3d 331, 337 (7th Cir. 2011).

Gunderson did not say anything about hepatitis B or C tests. Gunderson does not recall Harris asking her what tests would be conducted.

Harris signed the consent form and the disclosure form. Dkt. 54-1, at 12–13. Harris wrote on the disclosure form that he wanted only his HIV test results disclosed; he checked boxes saying that he did not want other categories of information, like drug-abuse or mental health information, to be released. Harris says that he consented so that Rhode would be put at ease that he was not infected with HIV.

Harris's blood was drawn in the Health Services Unit on March 22, 2016. The blood was sent to the Wisconsin State Laboratory of Hygiene and to a private lab for HIV and hepatitis testing. None of the tests were positive. Harris says that he read one of the results—showing a "Hep B Surface Ab Quant" of "<8"—and thought that he had tested positive for hepatitis B. Dkt. 54-1 at 9. This caused him great mental distress to the point of losing consciousness. He fainted, fell, and hurt his back. Further testing came back negative for hepatitis B.

Someone from the DOC (defendants don't know who and there are no records) gave Harris's test results to Murray, who informed Rhode of the results.[4]

---

[4] Rhode says that Murray told him about the negative test results. Dkt. 56, at 2. Harris says that this is hearsay, but this is incorrect. Defendants do not offer this fact for the truth of the matter asserted: that the test results really were negative. Rhode is free to testify that Murray shared the test results with him.

ANALYSIS

Harris brings claims under the Fourth and Fourteenth Amendments against defendants Manlove and Gunderson for misleading him about the scope of a voluntary blood draw and the intended use of the results.

To succeed on a motion for summary judgment, defendants must show that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). All reasonable inferences from the facts in the summary judgment record must be drawn in the nonmoving party's favor. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). If the nonmoving party fails to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment should be granted to the moving party. *Celotex*, 477 U.S. at 322.

**A. Fourth Amendment**

I granted Harris leave to proceed on Fourth Amendment theories that defendants Manlove and Gunderson misled Harris into thinking that (1) he was being tested only for HIV when he was really tested for hepatitis as well; and (2) Rhode would receive the results to allay his fears of infection, which was the reason that Harris agreed to consent to the draw. I also granted Harris leave to proceed on a Fourth Amendment theory that Manlove and Gunderson's decision not to disclose the test results to either Rhode or Rhode's medical provider shows that there was not a reason to conduct a draw in the first place.

Outside the prison context, a warrantless blood draw clearly implicates the Fourth Amendment. *See, e.g.*, *Missouri v. McNeely*, 569 U.S. 141 (2013). However, because Harris is a convicted prisoner, he has only a limited right to privacy under the Fourth Amendment. *Hudson v. Palmer*, 468 U.S. 517, 530 (1984) (Fourth Amendment gives prisoners no expectation of privacy with respect to contents of cells); *see also United States v. Shaw*, 824 F.3d 624, 629 (7th Cir. 2016). In the Seventh Circuit, an inmate can succeed on a Fourth Amendment unlawful search claim only when the challenged search involves an intrusion into his body. *Shaw*, 824 F.3d at 629 ("Under our precedent, [an inmate] could only claim that the prison personnel violated his constitutional rights if there were a search that somehow invaded his body."); *King v. McCarty*, 781 F.3d 889, 900 (7th Cir. 2015). The kinds of bodily intrusions that the Court of Appeals has recognized as implicating the Fourth Amendment include involuntary catheterization and abdominal surgery. *See Sparks v. Stutler*, 71 F.3d 259, 260–61 (7th Cir. 1995); *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 44–48 (1st Cir. 2009). In screening Harris's complaint, I stated that this court has previously concluded that an involuntary blood draw could violate the Fourth Amendment. *See Holm v. Casiana*, No. 16-cv-794-bbc (W.D. Wis. Feb. 2, 2017). The question under the Fourth Amendment is whether the search or seizure is objectively reasonable given the circumstances. *King*, 781 F.3d at 899. But even under this standard, courts give "considerable" deference to prison officials' judgments about institutional security. *Id.*

The Fourth Amendment doesn't come into play at all if the subject of a search voluntarily consents to it. But Harris contends that he was tricked into consenting to the blood draw because defendants lied about Harris being tested for HIV only and about where the results would be sent. I take Harris to be arguing that defendants' intent to deceive him can be

8

shown in part from the following facts: (1) even though Gunderson would have known from the policy and Manlove's order that hepatitis would also be tested, Gunderson spoke to him only about HIV consent; (2) defendants went ahead with the draw and hepatitis test despite Harris expressly limiting his authorization for release of medical information to HIV results only; and (3) Gunderson lied about Rhode being provided the test results, which Harris says is material because he agreed to the HIV test only because he thought that it would give Rhode peace of mind.

Looking at the record, Harris's evidence of deception on the part of defendants is very thin. Defendant Manlove did not directly communicate with Harris about getting consent for the search, so there is no evidence that he was involved in any deception. At most, Gunderson appears to have followed the DOC policy that talks about testing for HIV and hepatitis but limits the need for consent to HIV testing only. Harris's theory that officials lied about the testing being done for Rhode's benefit is unsupported by the record; Rhode says that he did receive the test results from a physician's assistant. But regardless whether Harris consented to the *HIV* test, it's undisputed that he did not consent to the entire search—he clearly did not consent to hepatitis searches.

The problem for Harris is that proving lack of consent doesn't resolve the Fourth Amendment claims. Even assuming no consent, Fourth Amendment law is unsettled on whether it is reasonable for prison officials to conduct warrantless, unconsented blood draws of prisoners. In my screening order and this order, I stated that courts have concluded that involuntary catheterization or forced blood draws might violate the Fourth Amendment. But the prisoners in those cases ultimately lost their lawsuits because the defendants invoked the

doctrine of qualified immunity. *See Sparks*, 71 F.3d at 261; *Holm v. Casiana*, 759 F. App'x 500, 502 (7th Cir. 2019). Defendants invoke the same qualified immunity defense here.

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Put a bit more bluntly, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The doctrine translates into a two-part test: (1) whether the public official violated the plaintiff's constitutional rights; and (2) whether those rights were clearly established at the time of the alleged violation. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). A right is "clearly established" when a reasonable official would know that his "conduct was unlawful in the situation he confronted." *Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 915 (7th Cir. 2011) (citations omitted).

The Court of Appeals for the Seventh Circuit has explained that the Fourth Amendment "protects, to some degree, prisoners' bodily integrity against unreasonable intrusions into their bodies." *King*, 781 F.3d at 900. But neither the Supreme Court nor the court of appeals has provided clear guidance for determining the situations in which the Fourth Amendment applies to searches of prisoners or the standards to be applied to evaluate a Fourth Amendment claim in this context. And as mentioned above, the court of appeals recently dismissed *Holm v. Casiana*, a forced blood-draw case, on qualified immunity grounds. So if Harris contended only that he was tricked into consenting, I would follow *Holm* and apply qualified immunity to his Fourth Amendment claims.

10

But in his amended complaint, Harris added another theory: that the deception and other facts show that there wasn't any legitimate reason to conduct to search his blood. He says that he did not sustain any cuts in the altercation, so Rhode was not actually at any risk of infection. Harris contends that defendants knew this, yet they went ahead with the blood draw anyway, seizing on the opportunity to discover whether Harris had HIV or hepatitis. He surmises that defendants did this out of concern that there might be a future incident where they could be put at risk. He says that defendants fail to present any evidence suggesting that Rhode was actually at risk of infection, and that his theory that the rationale for the draw was a sham is supported by the fact that defendants did not share the test results with Rhode's doctor.

Harris might overcome the qualified immunity defense by showing that staff intentionally conducted a blood draw for a manifestly improper purpose, similar to how a strip search or body-cavity search violates the Eighth Amendment if done for the purpose of sexually humiliating a prisoner instead of for a legitimate penological purpose. *See King*, 781 F.3d at 897. But Harris does not present any evidence showing that defendants acted with an improper purpose. Harris suggests that defendants have failed to present evidence proving that there was indeed a "significant exposure incident." That's not accurate, as defendants did present the incident report stating that there was "copious" amounts of blood at the scene. And Harris's medical exam from after the incident stated that he had a small cut on his lip. Dkt. 54-1, at 2.

Harris's theory fails because he presents no evidence showing that Manlove or Gunderson sought the blood draw for improper reasons. They say that they were not the DOC officials who concluded that there was a significant exposure incident. Manlove says that he was told that there was such an incident, he ordered the test, and Gunderson followed up with

Harris. As discussed above, defendants do not have the documentation showing exactly how the decision was made to call the altercation a significant exposure event, or who made that decision. But Harris does not produce evidence showing that Manlove or Gunderson knew the details of Harris's altercation or that they influenced the decision to call the altercation a significant exposure incident. As for Harris's assertion that defendants did not share the test results with Rhode's doctor, I've already addressed that: a medical professional did indeed get the information from the DOC and then tell Rhode. Without evidentiary support for his theory that defendants ordered the blood draw for illegitimate reasons, all Harris can do is speculate about why defendants acted the way they did, which is not enough to avoid summary judgment in favor of defendants.

B. **Fourteenth Amendment**

Under the Due Process Clause of the Fourteenth Amendments, a competent person has a liberty interest in refusing unwanted medical treatment. *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 262 (1990). I granted Harris leave to proceed on a due process claim about the blood draw. I take Harris to be contending that he was misled into consenting to the draw instead of rejecting it and forcing prison officials to go to state court for an order forcing the draw, as contemplated by the DAI policy. But Harris doesn't have a due process right to state officials following their own policies. *See Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 571 (7th Cir. 2016) ("our determination of whether the requirements of federal due process were satisfied is different from a determination of whether there was perfect compliance with an institution's rules").

Moreover, Harris's Fourteenth Amendment claims also fail under the qualified immunity doctrine. The Fourteenth Amendment "unwanted medical treatment" theory is not

as obvious as a fit for Harris's claims as the Fourth Amendment theory. Harris wasn't really being "treated" by the blood draw; he was being searched for Rhode's benefit. Nonetheless I allowed Harris to proceed because was subjected to a type of medical procedure.

But qualified immunity often extinguishes novel applications of legal theory. Neither Harris nor my own research reveals any case law showing that an inmate has a due process right in avoiding a simple investigatory blood draw. The types of cases in which a due process right has been found involve significantly more invasive types of medical treatment. *See, e.g.*, *Washington v. Harper*, 494 U.S. 210 (1990) (administration of psychotropic drugs); *Cruzan*, 497 U.S. 261 (artificial feeding and hydration equipment); *cf. Russell v. Richards*, 384 F.3d 444, 449 (7th Cir. 2004) (subjecting inmate to delousing shampoo does not require additional process). Because Harris does not have a clearly established right to due process before being subjected to a blood draw in prison, I will grant defendants' motion for summary judgment on Harris's Fourteenth Amendment claims.

ORDER

IT IS ORDERED that:

1. Plaintiff's motion to compel discovery, Dkt. 30, is DENIED.

2. Plaintiff's motion to strike defendants' brief opposing his motion for an extension of the dispositive-motions deadline, Dkt. 46, is DENIED as moot.

3. The parties' motions for an extension of the dispositive-motions deadline, Dkt. 42 and Dkt. 51, are GRANTED IN PART.

4. Defendants' motion for summary judgment, Dkt. 52, is GRANTED. The clerk of court is directed to enter judgment in favor of defendants and close the case.

Entered September 11, 2019.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge